Case No. 23-2965
Consolidated with Case Nos. 23-2966 and 23-2967

# IN THE UNITED STATES COURT OF APPEALS
# FOR THE EIGHTH CIRCUIT

AUSTIN MICHAEL BEBER, JACKIE DAMON,
*and*  CODY ROACH,
*Plaintiffs / Appellees*
vs.
NAVSAV HOLDINGS, LLC
*Defendant/Appellant.*

Appeal of Preliminary Injunctions from the
United States District Court for the District of
Nebraska, Honorable Brian C. Buescher
United States District Judge

APPELLEES' OPENING BRIEF

KOLEY JESSEN P.C., L.L.O.
Gregory C. Scaglione, #19368
Andrew Tugan, #26917
(*application pending*)
Emily M. Coffey, #27308
(*application pending*)
Timothy R. Hutchinson, #27880
(*application pending*)
One Pacific Place, Suite
800 1125 South 103rd
Street Omaha, NE 68124
(t) (402) 390-9500
(f) (402) 390-9005
Greg.scaglione@koleyjessen.com
Andrew.tugan@koleyjessen.com
Emily.coffey@koleyjessen.com
Timothy.hutchison@koleyjessen.com
Attorneys for Plaintiffs/Appellees

i

## SUMMARY OF THE CASE AND REQUEST FOR ORAL ARGUMENT

Appellees Austin Beber, Cody Roach and Jackie Damon ("Employees") worked for Universal Group, Ltd., a Nebraska insurance agency, with Beber and Roach selling insurance policies and Damon providing administrative support. Appellant NavSav Holdings, LLC, a Texas LLC, purchased Universal, obtained a Nebraska license, hired Employees to continue in their roles and assigned them to NavSav's Nebraska office. Employees resigned their employment with a two-week notice, and started working for UNICO Group, Inc., a Nebraska insurance agency.

Employees filed suits in Nebraska state court challenging their post-employment restrictive covenants and perfected service against NavSav, with Beber filing first, then Roach, followed by Damon. Beber and Roach secured TROs, and then NavSav removed all three cases. After NavSav was served with Beber's suit, it filed suit in a Texas state court against Employees and UNICO and obtained a TRO against Employees; however, NavSav failed to serve its Complaint and the Texas TRO on Employees before it expired. NavSav's Texas case was removed. The District Court entered Preliminary Injunctions prohibiting NavSav from enforcing noncompetition and non-solicitation covenants in the Employees' NavSav and Universal Agreements, and from making any filings, submissions, or appearances in the Texas cases. NavSav appeals the entry of those Preliminary Injunctions. Appellees request that both sides be given ten (10) minutes for oral argument.

Appellate Case: 23-2965    Page: 2    Date Filed: 01/12/2024 Entry ID: 5352978

# CORPORATE DISCLOSURE STATEMENT

The Appellees are individuals; thus a corporate disclosure is inapplicable.

Appellate Case: 23-2965    Page: 3    Date Filed: 01/12/2024 Entry ID: 5352978

# TABLE OF CONTENTS

Page

STATEMENT OF THE CASE.................................................................................. 1

SUMMARY OF THE ARGUMENT ......................................................................11

ARGUMENT ........................................................................................................ 12

   I.    STANDARD OF REVIEW ........................................................... 12

   II.    THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION BY ORDERING THAT NAVSAV CANNOT MAKE ANY FURTHER SUBMISSIONS, FILINGS, OR APPEARANCES IN THE TEXAS CASE. ............................................................... 13

   III.    THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION BY ORDERING THAT NAVSAV CANNOT TAKE ANY ACTION TO ENFORCE THE UNIVERSAL AGREEMENTS...................................................................................................... 16

   IV.    THE DISTRICT COURT DID NOT ERR OR ABUSE ITS DISCRETION IN APPLYING NEBRASKA LAW. ........................................................................... 21

   V.    THE DISTRICT COURT DID NOT ERR OR ABUSE ITS DISCRETION IN HOLDING THE UNIVERSAL AGREEMENTS TO BE UNASSIGNABLE AND PROHIBITING NAVSAV FROM ENFORCING THE UNIVERSAL AGREEMENTS. .................................. 31

   VI.    THE DISTRICT COURT DID NOT ERR OR ABUSE ITS DISCRETION IN GRANTING A PRELIMINARY INJUNCTION AS THE *DATAPHASE/WINTER* FACTORS WERE SATISFIED........................................................................................... 38

      A.   The District Court did not abuse its discretion in determining Beber, Roach, and Damon would suffer irreparable harm absent a preliminary injunction. .............................. 38

      B.   The District Court did not abuse its discretion in determining that the balance of harms favors Employees........................................................................................... 43

      C.   The District Court did not abuse its discretion in determining that Employees are likely to succeed on the merits of their claims. ............................................................... 44

      D.   The District Court did not abuse its discretion in determining that Public Interest favors entry of an injunction. ......................................................................................... 48

CONCLUSION.................................................................................................... 49

Appellate Case: 23-2965   Page: 4   Date Filed: 01/12/2024 Entry ID: 5352978

# TABLE OF AUTHORITIES

**Page(s)**

## Cases

*Agrigenetics, Inc. v. Rose*,
  62 F.3d 268 (8th Cir. 1995) ...................................................................32, 48

*Authentic Brands Grp. LLC v. Porter*,
  No. 14-16- 00477-CV, 2017 WL 2960047 (Tex. App. July 11,
  2017) .........................................................................................................10

*Baker by Thomas v. General Motors Corp.*,
  522 U.S. 222, 118 S. Ct. 657, 139 L. Ed. 2d 580 (1998), (as quoted
  in *O'Rourke v. Duncan*, No. 4:10-CV-957 CEJ, 2011 WL 1297546,
  at *4 (E.D. Mo. Mar. 31, 2011)).........................................................14, 15

*Barnes v. Frost Nat. Bank*,
  840 S.W.2d 747 (Tex. App. 1992).............................................................10

*D.M. by Bao Xiong v. Minnesota State High Sch. League*,
  917 F.3d 994 (8th Cir. 2019) ....................................................................39

*Dataphase Sys., Inc. v. C L Sys., Inc.*,
  640 F.2d 109 (8th Cir. 1981) (en banc) ...............................................12, 38

*DCS Sanitation Mgmt., Inc. v. Castillo*,
  435 F.3d 892 (8th Cir. 2006) ....................................................................34

*Dillon v. Nissan Motor Co.*,
  986 F.2d 263 (8th Cir. 1993) ....................................................................20

*Earth Sci. Lab'ys, Inc. v. Adkins & Wondra, P.C.*,
  246 Neb. 798, 523 N.W.2d 254 (1994) .....................................................33

*Fed. Ins. Co. v. Axos Clearing LLC*,
  982 F.3d 536 (8th Cir. 2020) ....................................................................13

*Federal Crop Ins. Corp v. Hester*,
  765 F.2d 723 (8th Cir. 1985) ....................................................................20

Appellate Case: 23-2965    Page: 5    Date Filed: 01/12/2024 Entry ID: 5352978

*Gaver v. Schneider's O.K. Tire Co.*,
  289 Neb. 491, 856 N.W.2d 121 (2014) ............................................................48

*Griffeth v. Sawyer Clothing, Inc.*,
  202 Neb. 631, 276 N.W.2d 652 (1979) ......................................31, 32, 34, 48

*H & R Block Tax Servs., Inc. v. Circle A Enterprises, Inc.*,
  269 Neb. 411, 693 N.W.2d 548 (2005) ............................................................48

*J&J Sports Prods., Inc. v. Moon Palace, Inc.*,
  No. CV H-15-3526, 2016 WL 4040124 (S.D. Tex. July 28, 2016) ..................10

*Knowlton v. Allied Van Lines*,
  900 F.2d 1196 (8th Cir. 1990) ........................................................................13

*MacGinnitie v. Hobbs Grp., LLC*,
  420 F.3d 1234 (11th Cir. 2005) ..........................................................39, 40, 42

*Matthew v. Unum Life Ins. Co. of Am.*,
  639 F.3d 857 (8th Cir. 2011) ..........................................................................20

*Moore Bus. Forms, Inc. v. Wilson*,
  953 F. Supp. 1056 (N.D. Iowa 1996) aff'd, 105 F.3d 663 (8th Cir.
  1996) ...............................................................................................................47

*Morris v. Zesati*,
  162 S.W.3d 669 (Tex. App.2005)....................................................................10

*Mut. Loan Co. v. Pierce*,
  65 N.W.2d 405 (Iowa 1954) ...........................................................................47

*Qwest Commc'ns Corp. v. Free Conferencing Corp.*,
  920 F.3d 1203 (8th Cir. 2019) ........................................................................22

*Sleep Number Corp. v. Young*,
  33 F.4th 1012 (8th Cir. 2022) ...................................................................12, 48

*Smith v. Toyota Motor Corp.*,
  964 F.3d 725 (8th Cir. 2020) ..........................................................................20

*Soo Line R.R. Co. v. Hawker Siddeley Canada, Inc.*,
  950 F.2d 526 (8th Cir. 1991) ..........................................................................13

Appellate Case: 23-2965    Page: 6    Date Filed: 01/12/2024 Entry ID: 5352978

*Sullivan v. United States*,
4 F.2d 100 (8th Cir. 1925) ...............................................................15

*Symphony Diagnostic Servs. No. 1 Inc. v. Greenbaum*,
828 F.3d 643 (8th Cir. 2016) .......................................................33, 34

*United States v. Stricker*,
4 F.4th 624 (8th Cir. 2021) ...............................................................20

*Unlimited Opportunity, Inc. v. Waadah*,
290 Neb. 629, 861 N.W.2d 437 (2015) .............................................34

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7, 129 S. Ct. 365, 172 L. Ed. 2d 249 (2008) ..............11, 12, 38, 41, 43

*Wise v Dep't of Transportation*,
943 F.3d (8th Cir. 2019) .............................................................38, 40

*Wright v. Sport Supply Grp., Inc.*,
137 S.W.3d 289 (Tex. App. 2004).....................................................46

**Statutes**

Tex. Bus. & Com. Code Ann. § 15.51(c) ..................................................46

*Tex. Civ. Prac. & Rem. Code Ann*. § 17.045 ..........................................10

**Other Authorities**

FRAP 28(a)(5-8) ......................................................................................12

Restatement (Second) of Conflicts of Laws § 187(1) ......................................22, 29

Appellate Case: 23-2965    Page: 7    Date Filed: 01/12/2024 Entry ID: 5352978

# STATEMENT OF THE CASE

*Beber Background*

Before April 12, 2022, Beber was employed as an at-will employee of Universal at its Nebraska office to sell policies for Universal to customers primarily in Nebraska, with some in Iowa, and none in Texas. (App. 161-62; R. Doc. 1-1, at 64- 65 ¶¶5, 11; App. 1046; R. Doc. 16, at 6 ¶11.) On April 12, 2022, NavSav acquired Universal, and Beber's at-will employment with NavSav started that same day. (App. 162; R. Doc. 1-1, at 65 ¶¶14,16.)

Though NavSav is a Texas LLC, NavSav leases office space at 2625 S 140th Street, Omaha, Nebraska to sell insurance policies to clients located in Nebraska. (App. 273-74; R. Doc. 1-1, at 176-77 ¶¶2-5; App. 944-45; R. Doc. 4, at 7-8.) Since April 28 2022, NavSav has been certified to transact business in Nebraska, maintains a registered agent and office Nebraska, and maintains the inactive tradename "Universal – Nebraska" in Nebraska. (App. 273; R. Doc. 1-1, at 176 ¶3.) NavSav, doing business as "Universal – Nebraska", obtained a Non-Resident license to engage in the business of insurance in Nebraska, with designated producers, yet NavSav has been engaged in the business of insurance in Nebraska before obtaining that license. (*Id.* ¶5.) NavSav's predecessor in interest (Universal) was licensed to sell policies in Nebraska. (App. 274; R. Doc. 1-1, at 177 ¶5.)

1

On April 20, 2022 (after employment commenced), NavSav presented Beber with its form Non-Competition, Non-Solicitation, Confidential and Non-Disclosure Agreement ("NavSav Agreement") for no consideration. (App. 162-63; R. Doc. 1-1, at 65-66 ¶¶16-22.) Beber signed, dated, and returned the NavSav Agreement to NavSav on April 25, 2022. (App. 163; R. Doc. 1-1, at 66 ¶20.) Beber did not participate in any negotiations or drafting of the NavSav Agreement, nor was Beber represented by counsel in that regard. (*Id*. ¶¶21-22.) NavSav is an insurance agency conglomerate, with approximately 60-70 individual agencies, a 10 person executive management team, operates in at least 17 States, and boasts access to 150+ carriers. (App. 162; R. Doc. 1-1, at 65 ¶15.) Beber had significantly less bargaining power, resources and sophistication than NavSav regarding the NavSav Agreement.

Sections 4, 17 and 18 of the NavSav Agreement ("Contested Provisions") contain the relevant restrictive covenants and Texas choice of law and venue provisions. (App. 163-65; R. Doc. 1-1, at 66-68 ¶¶23-25; App. 174-182; R. Doc. 1-1, at 77-85.)

At NavSav, Beber primarily worked out of the NavSav Nebraska office (same as the Universal office), and never in Texas. (App. 165; R. Doc. 1-1, at 68 ¶27.) Beber's NavSav paychecks deducted Nebraska withholdings. (App. 166; R. Doc. 1-1, at 69 ¶29.) At NavSav, Beber sold NavSav insurance policies, and never solicited or procured customers in Texas. (App. 165-66; R. Doc. 1-1, at 68-69 ¶¶26,28.) Rather,

2

the vast majority of the policies Beber solicited or procured for NavSav were to policyholders located in Nebraska. (App. 166; R. Doc. 1-1, at 69 ¶28; App. 1045-46; R. Doc. 16, at 5-6 ¶¶10-11.)

On June 1, 2023, Beber resigned from NavSav. (App. 166; R. Doc. 1-1, at 69 ¶30.) On June 5, 2023, NavSav's CEO told Beber that he did not mind if Beber competed with NavSav after Beber's employment ended as Beber has to earn a living, but that NavSav will protect its customers and that if Beber solicits any NavSav customer, NavSav will sue Beber in Texas to enforce the restrictive covenants contained in the NavSav Agreement. (*Id.* ¶34.) In reliance thereon and on Nebraska law and public policy, Beber accepted employment with the insurance and financial provider UNICO, and started on June 19, 2023. (App. 166; R. Doc. 1-1, at 69 ¶35; App. 167; R. Doc. 1-1, at 70 ¶39.)

Considering NavSav's threats to enforce the restrictive covenants in the NavSav Agreement, Beber filed his Complaint on June 23, 2023, and on June 28, 2023, perfected service on NavSav. (App. 263; R. Doc. 1-1, at 166; App. 273-315; R. Doc. 1-1, at 176-218.)

On June 26, 2023, after NavSav had been served with the Nebraska suit, NavSav filed a Petition against Employees and UNICO in a Texas state court ("Subsequent Texas Case") (App. 185; R. Doc. 1-1, at 88 ¶3.) In the Subsequent Texas Case, on July 5, 2023, NavSav filed its Amended Petition against Beber. (*Id.* ¶4.) Beber has not been

3

served with process for the Subsequent Texas Case. (App. 168; R. Doc. 1-1, at 71¶48.) On July 6, 2023, in the Subsequent Texas Case, without notice and while no service of process had been perfected against Beber, NavSav secured an ex parte temporary restraining order against Beber, Roach and Damon restraining them from among other things certain competition and solicitation of business in Nebraska. (*Id.* at ¶49; App. 239-43; R. Doc. 1-1, at 142-146.) On July 17, 2023, the Texas TRO was extended. (App. 244-45; R. Doc. 1-1, at 147-48.) NavSav has neither served that TRO nor its extension on Beber. (App. 168; R. Doc. 1-1, at 71 ¶49.) UNICO removed the Subsequent Texas Case to a Texas federal court. (App. 1050-60; R. Doc. 16, at 10-20.)

On July 21, 2023, the Nebraska state court entered a TRO against NavSav, which was served on NavSav and the cash deposit was made that same day. (App. 101, 114, 117-28; R. Doc. 1-1, at 4, 17, 20-31.) NavSav thereafter removed the Nebraska case. (App. 95-97; R. Doc. 1, at 1-3.) On July 28, 2023, Beber filed a motion to extend the existing State court TRO and for Preliminary Injunction. (App. 318-44; R. Doc. 4, at 1-27.) On July 31, 2023, the District Court extended the TRO (with bond posted) and set hearing and submission deadlines for the Motion for Preliminary Injunction. (App. 345-51; R. Doc. 5, at 1-6.)

*Roach Background*

Prior to April 12, 2022, Roach was employed as an at-will employee of Universal at its Nebraska office, selling policies for Universal to customers primarily

4

in Nebraska and Iowa, and none in Texas. (App. 521; R. Doc. 1-1, at 65 ¶¶3-4.) Roach's at- will employment NavSav began on April 12, 2022. (App. 521-22; R. Doc. 1-1, at 65-66 ¶¶6,8.) On April 20, 2022 (after employment commenced), NavSav presented Roach with its form NavSav Agreement for no consideration. (App. 522; R. Doc. 1- 1, at 66 ¶¶9-11.) Roach signed, dated, and returned the NavSav Agreement on April 26, 2022. (*Id.* ¶¶9-12.) Roach did not participate in any negotiations or drafting of the NavSav Agreement, nor was Roach represented by counsel in that regard. (*Id.* ¶¶9-14.) Roach had significantly less bargaining power, resources and sophistication than NavSav regarding the NavSav Agreement.

Roach's Contested Provisions are at (App. 541-49; R. Doc. 1-1, at 85-93.) At NavSav, Roach primarily worked out of the NavSav Nebraska office (same as the Universal office), and never in Texas. (App. 525; R. Doc. 1-1, at 69 ¶19.) Roach's NavSav paychecks deducted Nebraska withholdings. (*Id.* ¶21.) At NavSav, Roach sold NavSav insurance policies, and never solicited or procured customers in Texas. (App. 524-25; R. Doc. 1-1, at 68-69 ¶¶18, 20.) Rather, the vast majority of the policies Roach solicited or procured for NavSav were to policyholders located in Nebraska and Iowa. (*Id.*)

On June 1, 2023, Roach resigned from NavSav. (App. 525; R. Doc. 1-1, at 69 ¶22.) On June 2, 2023, NavSav's CEO told Roach that he "would come after him" if Roach went to work for a competitor or if Roach contacted any of NavSav's customers.

5

(*Id.* ¶25.) On or about June 28, 2023, Roach received a letter from NavSav's attorneys dated June 9, 2023, reminding Roach of the restrictive covenants contained in the NavSav Agreement. (App. 525-26; R. Doc. 1-1 at 69-70 ¶27.) In reliance on Nebraska law and public policy, Roach accepted employment with the insurance and financial provider UNICO, and started on June 19, 2023. (App. 526; R. Doc. 1-1, at 70 ¶31.)

Considering NavSav's threats to enforce the restrictive covenants contained in the NavSav Agreement, Roach filed his Complaint against NavSav on June 30, 2023, and on July 5, 2023, Roach filed his Amended. (App. 646-94, 702-30; R. Doc. 1- 1, at 190-238, 246-274.) On July 7, 2023, Roach perfected service on NavSav, and Roach's counsel emailed NavSav's Texas counsel a copy of the Amended Complaint. (App. 527-28; R. Doc. 1-1, at 71-72¶45; App. 630; R. Doc. 1-1, at 174.) Roach was never served with process, the Texas TRO or its extension in the Subsequent Texas Case. (App. 527; R. Doc. 1-1, at 71¶¶43-44.)

On July 24, 2023, the Nebraska state court entered a TRO against NavSav, which was served on NavSav and the cash deposit was made that same day. (App. 460-87; R. Doc. 1-1, at 4-31.) NavSav thereafter removed the Nebraska Case. (App. 454-56; R. Doc. 1, at 1-3.) On July 31, 2023, Roach filed Motions to extend the existing State Court TRO and for Preliminary Injunction. (App. 739-65; R. Doc. 6, at 1-27.) On July 31, 2023, the District Court extended the TRO (with bond posted) and set hearing and submission deadlines for the Motion for Preliminary Injunction. (App. 733-38, 766; R.

Doc. 5, at 1-6.)

*Damon Background*

On and before 2014, Damon resided in Nebraska, and started working for Universal in 2014. (App. 1043; R. Doc. 16, at 3 ¶2.) While at Universal, Damon's at-will employment duties were administrative and included servicing Universal's commercial accounts, submitting claims, and addressing billing issues, almost exclusively for Beber, and she never solicited or procured policies or clients, nor was she paid commissions. (*Id.*)

On October 16, 2014, Damon secured a Nebraska resident license, and since then, Damon has maintained that license, though it converted to "non-resident" license in 2016 after she moved to Ankeny, Iowa. (*Id.* ¶3.) From its issuance, Damon's Nebraska license notes her business address as Universal's (now NavSav's) Nebraska office and her business fax and phone numbers as Universal's (now NavSav's) numbers starting with the Nebraska "402" area code. (App. 1043-44; R. Doc. 16, at 3-4 ¶3.)

Once she moved to Iowa and secured her Iowa license, Damon worked remotely for Universal from her home, though she remained assigned to Universal's Nebraska office, where she occasionally was physically present. (*Id.* ¶¶3-5.) At all times, Damon's Iowa license notes her business address as Universal's (now NavSav's) Nebraska office location and her business fax and phone numbers as Universal's (now NavSav's) numbers starting with the Nebraska "402" area code. (*Id.*) ***Throughout her***

7

*employments,* Universal and NavSav (a/k/a in Nebraska by the tradename "Universal") advertised Damon as a member of the "Nebraska Team," and provided her with business cards and an email signature block noting her location as the "Universal" Nebraska office with Nebraska phone and fax numbers. (App. 1044-45; R. Doc. 16, at 4-5 ¶¶6-8.)

On or before April 11, 2022, Damon's employment with Universal ended, and on or about April 12, 2022, Damon began her employment with NavSav. (App. 1045; R. Doc. 16, at 5 ¶9.) Damon's at-will employment duties at NavSav were administrative and included servicing NavSav's commercial accounts, submitting claims, and addressing billing issues, almost exclusively for Beber, but never soliciting or procuring policies or clients, or receiving commissions. (*Id.*) During Damon's employment with Universal and NavSav, 95% or more of the work Damon performed was for customers based in Nebraska, with only 4-5% of customers based in Iowa, and none in Texas. (*Id.* ¶10.)

On June 19, 2023, Damon started her at-will employment with UNICO, where she has served in the same role and performed the same administrative duties as she did for Universal/NavSav. (App. 1045-46; R. Doc. 16, at 5-6 ¶11.) During her employment with UNICO, 99% or more of the work Damon performed was and is for customers based in Nebraska, with only 1% of customers based in Iowa, with none in Texas. (*Id.*) UNICO assigned Damon to its "Nebraska Team," provides Damon a

8

primary office at its Lincoln, Nebraska location, and allows Damon to work remotely from her Iowa home. (*Id.*)

On April 18, 2022 (after employment commenced), NavSav presented Damon with its form NavSav Agreement for no consideration. (App. 875; R. Doc. 1-1, at 3 ¶¶17-19.) Damon signed, dated, and returned the NavSav Agreement on April 18, 2022. (*Id.* ¶20.) Damon did not participate in any negotiations or drafting of the NavSav Agreement, nor was Damon represented by counsel in that regard. (*Id.* ¶¶21-22.) Damon had significantly less bargaining power, resources and sophistication than NavSav regarding the NavSav Agreement.

Damon's Contested Provisions are at App. 901-909; R. Doc. 1-1, at 29-37. On June 1, 2023, Damon resigned from NavSav. (App. 878; R. Doc. 1-1, at 6 ¶32.) On June 20, 2023, Damon received a letter from NavSav's attorneys, reminding Damon of the purported restrictive covenants contained in the NavSav Agreement. (App. 911-921; R. Doc. 1-1, at 39-49.) In reliance on Nebraska law and public policy, Damon accepted employment with the insurance and financial provider UNICO. (App. 880; R. Doc. 1-1, at 8 ¶43.)

Considering NavSav's threats in Texas to enforce the restrictive covenants in the NavSav Agreement, Damon filed her Complaint against NavSav on July 7, 2023. (App. 873-921; R. Doc. 1-1, at 1-49.) On July 10, 2023, Damon perfected service on NavSav, and NavSav counsel entered appearances. (App. 927; R. Doc. 1-1, at 55; App.

9

930-33; R. Doc. 1-1, at 58-61.) Damon was never served with process, the Texas TRO or its extension in the Subsequent Texas Case. (App. 946, 966; R. Doc. 4, at 9, R. Doc. 5, at 3 ¶2.) On August 25, 2023, the District Court entered a Preliminary Injunction, and Damon timely posted the required bond. (App. 90-94; R. Doc. 22, at 1-5; Notice of Electronic Filing from the U.S. District Court, District of Nebraska, August 28, 2023.)

When referring to NavSav's failure to serve Employees with the Texas process, TRO or its extension, note that NavSav sent such process to the Texas Secretary of State, who then had 60 days to serve the nonresident Appellee's via certified mail. *Tex. Civ. Prac. & Rem. Code Ann.* § 17.045. Those mailings were never delivered to Appellees, and the record fails to show if or when the mailings ever happened, whether they were unclaimed or refused, or whether any Appellee engaged in business in Texas. *Barnes v. Frost Nat. Bank,* 840 S.W.2d 747, 750 (Tex. App. 1992). Proof of the Secretary of State's "forwarding" of the process is required, yet is absent from this record. *Authentic Brands Grp. LLC v. Porter*, No. 14-16- 00477-CV, 2017 WL 2960047, at *3 (Tex. App. July 11, 2017); *Buffalo Pats., LLC ZTE Corp.*, 605 F. Supp. 3d 917, 926 (W.D. Tex. 2022), appeal dismissed, No. ¶ 2022-2132, 2022 WL 18695552 (Fed. Cir. Oct. 13, 2022). The deadline to file an answer is measured from when defendant receives the process, not when the Secretary of State receives it. *Morris v. Zesati*, 162 S.W.3d 669, 672 (Tex. App.2005); *J&J Sports Prods., Inc. v. Moon Palace,*

10

*Inc.*, No. CV H-15-3526, 2016 WL 4040124, at *1 (S.D. Tex. July 28, 2016).

## SUMMARY OF THE ARGUMENT

Based on undisputed evidence and NavSav's judicial admissions, there is sufficient support for the factual findings that Nebraska's relationship is substantial and its interests are materially greater than any other State as to each party, to the employment and post-employment conduct of the parties, and to the commerce sought to be restrained. Thus, the District Court correctly chose Nebraska law as governing, and thereunder, the post-employment restrictive covenants in the NavSav Agreements fail and cannot be reformed.

NavSav misrepresents the record as all parties raised the issues of validity and enforceability of the Universal Agreements before the District Court, and the District Court correctly ruled that the parties did not intend the post-employment restrictive covenants in the Universal Agreements to be assignable. Even if assignable, they were superseded by the NavSav Agreements and are otherwise unenforceable.

The District Court flexibly balanced and did not merge the *Winter* factors and correctly determined that Employees are entitled to the Preliminary Injunctions. NavSav failed to raise a denial of due process claim, and NavSav indeed received and will continue to receive due process before the District Court, as NavSav has rights to file counterclaims against the Appellees and a third-party complaint against UNICO in this Nebraska proceeding, and was properly restrained from seeking enforcement of

11

the restrictive covenants in Texas. As such, the Preliminary Injunctions are sufficiently tailored. At this early stage of the proceedings, there is no reason to second guess the scope of the Preliminary Injunctions, and this Court should leave it to the District Court to determine in future proceedings, benefited by the completion of the pleadings and discovery phases, whether the Preliminary Injunctions should be modified or dissolved.

## **ARGUMENT**

### I. **STANDARD OF REVIEW**

This Court reviews the grant of a preliminary injunction for abuse of discretion, examining factual findings for clear error and legal conclusions *de novo*. *Sleep Number Corp. v. Young*, 33 F.4th 1012, 1016 (8th Cir. 2022). The factors that determine whether the movant is entitled to a preliminary injunction are "(1) the threat of irreparable harm to the movant; (2) the state of the balance between this harm and the injury that granting the injunction will inflict on other parties litigant;(3) the probability that the movant will succeed on the merits; and (4) the public interest." *Id.* (brackets omitted); *see Dataphase Sys., Inc. v. C L Sys., Inc.*, 640 F.2d 109, 114 (8th Cir. 1981) (en banc); *see also Winter v. Nat. Res. Def. Council, Inc*., 555 U.S. 7, 20, 129 S. Ct. 365, 374, 172 L. Ed. 2d 249 (2008). NavSav's eight statements of issues are not presented in its Argument section in the same sequence or substance as they are identified in its statement of issues. Br. 2-3,14–49. FRAP 28(a)(5-8) requires NavSav to make "a

12

statement of the issues presented for review" and those statement of issues must be summarized and argued in the body of the brief with appropriate legal and record citations. NavSav's appeal should be limited to its eight statements of issues presented and actually argued in its brief. *Fed. Ins. Co. v. Axos Clearing LLC*, 982 F.3d 536, 542 n.5 (8th Cir. 2020). This brief will respond to NavSav's arguments in the order NavSav briefed them, not in the sequence of its statement of issues.

## II.    THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION BY ORDERING THAT NAVSAV CANNOT MAKE ANY FURTHER SUBMISSIONS, FILINGS, OR APPEARANCES IN THE TEXAS CASE.

NavSav's first argument relates to statement of issue No. 6. As noted above, NavSav has substantial connection to and presence in Nebraska, which are more than sufficient to establish personal jurisdiction. *Soo Line R.R. Co. v. Hawker Siddeley Canada, Inc*., 950 F.2d 526, 528 (8th Cir. 1991); *Knowlton v. Allied Van Lines*, 900 F.2d 1196, 1199 (8th Cir. 1990)(service on registered agent constitutes consent to personal jurisdiction). The District Court had jurisdiction over NavSav to restrain NavSav from violating Nebraska law and public policy and unlawfully restraining Nebraska commerce, as NavSav concedes. Br. 15.

NavSav vaguely asserts that the District Court cannot "issue an injunction on the parties in a different venue," and because the Texas Court cannot enforce such the injunction, it is invalid. *Id.* First, NavSav did not raise this issue before the District Court, as it is nowhere in its opposing brief even though Employees sought an order

13

instructing NavSav not to take any further action to enforce the NavSav Agreement, the Universal Agreement, or "making any further submissions, filings or appearances in the Texas federal action". (App. 352-78; R. Doc. 7, at 1-28; App. 428; R. Doc. 16, at 1.) The only argument NavSav made regarding limiting the preliminary injunction to Nebraska-based conduct relates to the conduct of Beber, Roach and Damon, not NavSav. (App. 377; R. Doc. 7, at 26.) However, NavSav never identified any rule or statute authorizing dismissal of these actions because they were not in the "chosen forum" and never argued for transfer of these actions to Texas. (*Id.*) During the preliminary injunction hearing, NavSav argued—albeit only in passing—that the cases should be dismissed, but NavSav did not identify any rule, statute, or other authority permitting dismissal of these actions because they were not in the "chosen forum," and NavSav did not argue for transfer of these actions to Texas. (Transcript of Preliminary Injunction Hearing at 41:12-18.)

Now on appeal, NavSav cites *Baker by Thomas v. General Motors Corp.*, 522 U.S. 222, 118 S. Ct. 657, 139 L. Ed. 2d 580 (1998), (as quoted in *O'Rourke v. Duncan*, No. 4:10-CV-957 CEJ, 2011 WL 1297546, at *4 (E.D. Mo. Mar. 31, 2011)), but that holding narrowly ruled that "a Michigan court cannot, by entering the injunction to which Elwell and GM stipulated, dictate to a court in another jurisdiction that evidence relevant in the Bakers' case-a controversy to which Michigan is foreign-shall be inadmissible." *Id.* at 224. The *Baker* Court explained:

14

This conclusion creates no general exception to the full faith and credit command, and surely does not permit a State to refuse to honor a sister state judgment based on the forum's choice of law or policy preferences. This Court simply recognizes, however, that, just as the mechanisms for enforcing a judgment do not travel with the judgment itself for purposes of full faith and credit, and just as one State's judgment cannot automatically transfer title to land in another State, similarly the Michigan decree cannot determine evidentiary issues in a lawsuit brought by parties who were not subject to the jurisdiction of the Michigan court.

*Id*. The Preliminary Injunctions contain no enforcement mechanisms for application in Texas (enforcement was never at issue) or restrictions on any Texas court's jurisdiction; instead they exclusively restrict NavSav's ability to re-litigate the same issues in Texas and practically allow NavSav to seek relief relating to Employees from the District Court alone. This is proper, as the District Court has jurisdiction over all the parties, and has subject matter jurisdiction to issue sanctions for violations within its district. *Sullivan v. United States*, 4 F.2d 100 (8th Cir. 1925) (court that issues injunction is court against which contempt is committed and which has jurisdiction to issue sanction). According to NavSav, the Texas court cannot enforce the Preliminary Injunctions, so no due process could be denied. Whether a Texas court can "enforce" the Preliminary Injunctions, has no relevance to whether the District Court properly granted them. Moreover, "enforcement" has not been requested or ruled on, so there is no final "enforcement" order that could be subject to appellate review.

NavSav cites no authority to support a claim that its due process rights have

15

been denied nor did it raise that argument below. NavSav falsely claims a denial of due process because NavSav is deprived "of the opportunity to proceed with its case in court." Br. 49. With the Preliminary Injunctions in hand, that Texas court granted NavSav leave to make such filings, which NavSav did. (Entry ID 5351385, ¶¶2-4.) Moreover, NavSav received and will continue to receive due process before the District Court, as NavSav has rights to file counterclaims against the Appellees and a third-party complaint against UNICO in this Nebraska proceeding. NavSav's due process argument lacks any legal or factual support and should be rejected summarily.

Finally, given the vast differences in Texas and Nebraska laws and public policies on post-employment covenants, that commerce in Nebraska is what is sought to be restrained and that a Nebraska based employer (NavSav) seeks to evade Nebraska law and public policy applicable to its employees assigned to Nebraska, the factual basis presented a need for extraordinary relief, and there is no clear error in those factual findings, and the District Court did not abuse its discretion by allowing NavSav to bring its claims in Nebraska and restraining NavSav's restrictive covenant enforcement attempts in Texas.

## III. THE DISTRICT COURT DID NOT ABUSE ITS DISCRETION BY ORDERING THAT NAVSAV CANNOT TAKE ANY ACTION TO ENFORCE THE UNIVERSAL AGREEMENTS.

NavSav's second argument relates to statement of issue No. 8: "[t]he District Court abused its discretion in enjoining NavSav from taking any action to enforce the

16

restrictive covenants in the Universal Agreements" for the sole reason that "Appellees did not request an injunction or any action from the District Court in their moving papers for the Universal Agreements." Br. 8. NavSav misrepresents the record as all parties raised the issues of validity and enforceability of the Universal Agreements before the District Court, and the District Court ruled on them.

In Beber's Complaint, he referenced (App. 274-75; R. Doc. 1-1, at 177-78) and attached his Universal Agreement (App. 301-5; R. Doc. 1-1, at 204-208), alleged it was unenforceable (App. 292-95; R. Doc. 1-1, at 195-198), and sought an unenforceability declaration and injunctions (App. 294-96; R. Doc. 1-1, at 197-99.) In response to Beber's motion for injunctive relief (App. 318-44; R. Doc. 4, at 1-27), NavSav raised the enforceability and assignability of his Universal Agreement (App. 353-54, 376; R. Doc. 7, at 2-3, 25; App. 813-14; R. Doc. 9-6, at 1-2.) (the Universal Agreement "while not at issue in this motion, must be considered from a likelihood of success standpoint and would weigh against a preliminary injunction."). NavSav offered evidence to support the issues it raised with the Universal Agreement. (App. 382-88; R. Doc. 8-1, at 1- 7; App. 392-94; R. Doc. 8-3, at 1-3; App. 399-400; R. Doc. 8-6, at 1-2.) In response to NavSav's materials, Beber supplemented his requested relief to include to include rulings on his Universal Agreement (App. 428-46; R. Doc. 16, at 1-20.) NavSav did the same concerning Roach's motion for injunctive relief (App. 353-54; R. Doc. 7, at 2-3; App. 376; R. Doc. 7, at 25; App. 382-88; R. Doc. 8-1, at 1-7;

17

App. 392-98; R. Doc. 8-3:8-5) and in response to NavSav's actions, Roach supplemented his requested relief to include rulings on his Universal Agreements (App. 842-862; R. Doc. 14, at 1-21.)

At the combined hearing on Beber and Roach's motion for preliminary injunctions, NavSav's evidence relating to the Universal Agreements was admitted (Transcript of Preliminary Injunction Proceedings, at 5:12-7:21), and NavSav then argued that the Universal Agreements apply (Transcript of Preliminary Injunction Proceedings, at 36:5-42:11). Because NavSav raised the enforceability and assignability of the Universal Agreements, the District Court held that "we've got to go there on the Universal agreements given the discussion I had with" NavSav's counsel. (Transcript of Preliminary Injunction Proceedings, at 51:8-15.) In its Order, the District Court addressed these issues argued by all parties. (App. 7-9, 30-32; R. Doc. 25, at 7-9, 30-32.)

The same circumstances occurred when Damon's motion for injunctive relief was briefed by Damon and NavSav and when the District Court held the evidentiary hearing on Damon's motion for injunctive relief. In Damon's submissions, she expressly raised the unenforceability of her Universal Agreements and sought related declaratory and injunctive relief (App. 938, 959, 961; R. Doc. 4, at 1, 22, 24; App. 1068-87; R. Doc. 18, at 1-21.) The District Court then set deadlines for the parties to file briefs, evidence and exhibit lists. (App. 967-69; R. Doc. 6, at 1-3.) NavSav raised

18

the enforceability and assignability of Damon's Universal Agreements. (App. 971-72, 991-92; R. Doc. 8, at 2-3, 22-23; App. 1007-10; R. Doc. 9-4, at 1-2, R. Doc. 9-5 at 1-2; App. 996-1000; R. Doc. 9-1, at 1-5; App. 1004-10; R. Doc. 9-3, at 1-3, R. Doc. 9-4, at 1-2, R. Doc. 9-5, at 1-2; App. 399-400; R. Doc. 8-6, at 1-2; App. 1032-38; R. Doc. 9-9, at 1-7; *see* App. 235-36; R. Doc. 1-1, at 138-39 *referencing* App. 204-12; R. Doc. 1-1, at 107-15; Transcript of Preliminary Injunction Proceedings at 5, 70:18-77:8; *Id.* at 67-68, 70:16-71:11 incorporating *Id.* at 36:5-42:11.) The District Court stated that because NavSav raised the enforceability and assignability of Damon's Universal Agreements, "we've got to go there on the Universal agreements given the discussion I had with" NavSav's counsel. (*Id.* at 67-68, 77:16-78:11) *incorporating* (*Id.* at 51:8-15, 36:5-42:11, 73:5-75:18.)  In its Order, the District Court addressed these issues argued by all parties. (App. 47-51, 75, 79-82; R. Doc. 21, at 1-5, 29, 33-36.)

The enforceability and assignability of the Universal Agreements were thus raised and argued by all parties, injunctive relief was requested, related evidence was admitted, and the District Court expressly ruled on those jointly presented issues. Even if not raised, NavSav expressly invited, offered briefing, evidence and oral arguments, and failed to object to the District Court addressing such issues. NavSav suffered no prejudice and cannot now complain that the District Court erred in taking the action that NavSav itself requested.

The invited error doctrine expressly prohibits NavSav from raising

enforceability of the Universal Agreements before the District Court and then complaining when the District Court addressed the enforceability of the Universal Agreements. The invited error doctrine is a species of waiver, that "applies when the trial court announces its intention to embark on a specific course of action and defense counsel specifically approves of that course of action." *Matthew v. Unum Life Ins. Co. of Am.*, 639 F.3d 857, 868 (8th Cir. 2011) (*quoting United States v. Jewell,* 614 F.3d 911, 920 (8th Cir. 2010)); *Dillon v. Nissan Motor Co.,* 986 F.2d 263, 269 (8th Cir. 1993). The purpose of the invited error doctrine is to "prevent[ ] a defendant from leading the district court 'down a primrose path' and later, on appeal, profiting from the invited error." *United States v. Stricker*, 4 F.4th 624, 628 (8th Cir. 2021). "An erroneous ruling generally does not constitute reversible error when it is invited by the same party who seeks on appeal to have the ruling overturned." *Smith v. Toyota Motor Corp.*, 964 F.3d 725, 730 (8th Cir. 2020). In other words, the doctrine exists to prevent a party from inviting an error at the trial court level that will create grounds for appeal if the judgment does not come out in the party's favor. There can be no reversible error when the error is invited *Federal Crop Ins. Corp v. Hester*, 765 F.2d 723, 726-27 (8th Cir. 1985).

Regarding the Proprietary Information Agreements, only Roach and Damon signed one. The record shows that all three returned and destroyed all of NavSav protectable records. (App. 166-67; R. Doc. 1-1, at 69-70 ¶¶30-38; App. 525-26; R.

20

Doc. 1-1, at 69 ¶¶22-26, 30; App. 878-79; R. Doc. 1-1, at 6-7 ¶¶32-36, App. 1047; R. Doc. 16, at 7 ¶15 .)

Even with access to its computers and servers that employees used, NavSav offered no evidence to contradict this sworn testimony (no improper downloads, emails or copies) or to identify and qualify any of its records as protectable by contract, statute or otherwise.

The District Court did not err by ruling on enforceability of the Universal Agreements because that issue was properly before the District Court and even if they were not raised below, the invited error doctrine precludes NavSav from contesting the District Court's decision on this issue. That should end the appellate review, as NavSav's sole appellate argument is that such relief was not sought. The interim prohibitions on enforcement of the Universal Agreements are based on uncontroverted factual findings that are not clearly erroneous.

## IV. THE DISTRICT COURT DID NOT ERR OR ABUSE ITS DISCRETION IN APPLYING NEBRASKA LAW.

NavSav's third argument relates to statement of issue No. 2, claiming that the District Court "erred and abused its discretion by applying Nebraska law when" analyzing the NavSav Agreements. Br. 19. NavSav does not challenge the District Court's ruling that (a) there is a conflict between Texas and Nebraska laws (App. 19-20; R. Doc. 25, at 19-20); (b) Nebraska choice-of-law rules for contract cases applies

21

(App. 20-21; R. Doc. 25, at 20-21); and (c) Restatement (Second) of Conflicts of Laws § 187(1) does not apply and § 187(2) applies (App. 21-23; R. Doc. 25, at 21-22). Also, NavSav does not challenge the application of Nebraska law to the Universal Agreements. Br. 20-31. NavSav only challenges the District Court's factual findings under § 187(2). *Id.* 19-30. Thus its statement of error can only be that the District Court's ruling was based on 'a clearly erroneous assessment of the evidence.' *Qwest Commc'ns Corp. v. Free Conferencing Corp.*, 920 F.3d 1203, 1205 (8th Cir. 2019) (*quoting Highmark Inc. v. Allcare Health Mgmt. Sys., Inc*., 572 U.S. 559, 563 n.2, 134 S.Ct. 1744 (2014).

NavSav opens its argument with a venue discussion relating enforcement of forum selection clauses. However, that issue is not before this Court – indeed NavSav filed a separate motion on that issue, which the District Court ruled on after NavSav filed the present appeal and is not the subject of NavSav's appeal. Entry ID 5351385. NavSav next argues that the District Court made clearly erroneous factual findings under § 187(2) in deciding to disregard the choice of Texas law provision in the NavSav Agreements, namely that "[t]he legality of this Agreement and of any other terms or provisions, as well as the rights and duties of the parties hereunder, shall be governed by the laws of the State of Texas." (App. 576, 585, 594; R. Doc. 1-1, at 120, 129, 138.) The District Court correctly analyzed and cited legal and record authorities to support its findings, which need not be repeated here. (App. 19-25; R. Doc. 25, at

19-25; App. 62-74; R. Doc. 21, at 16-28.)

Instead, the counterarguments will focus on NavSav's two briefed arguments, that "Texas has a substantial relationship to the parties and the transaction" and that Nebraska does not have a materially greater interest. Br. 21-25. NavSav improperly invites this Court to retry the facts *de novo,* by stating that "Appellees cannot carry their heavy affirmative burden to demonstrate that Nebraska has a materially greater interest as necessary to invalidate the parties' agreed upon choice of law provision, and Texas law should apply." Br. 25. As cited above, the standard of review is for clearly erroneous factual findings. The evidence and NavSav's judicial admissions, most of which is undisputed, sufficiently support the factual findings that Nebraska's relationship is substantial and its interest materially greater than any other State as to each party, to the employment and post-employment conduct of the parties, and to the commerce sought to be restrained.

As for NavSav, though it is a Texas LLC with its principal place of business in Texas (App. 273; R. Doc. 1-1, at 176 ¶2; App. 168; R. Doc. 1-1, at 71 ¶50), it is certified to transact business in Nebraska, maintains a registered office and agent in Nebraska, leases and maintains an office in Nebraska, is licensed to sell insurance in Nebraska, sells insurance policies to individuals and companies located in Nebraska, maintains an inactive trademark in Nebraska, employs employees in Nebraska (Dan Headlee), purchased a Nebraska business, withholds and remits Nebraska income tax

withholdings, its top officers were physically present in Nebraska and advertised in Nebraska that its employees were on the NavSav Nebraska team. (App. 273; R. Doc. 1-1, at 176 ¶¶3-5; App. 21-23, 29-32, 36-39; R. Doc. 25, at 21-23, 29-32, 36-39; App. 168; R. Doc. 1-1, at 71 ¶50; App. 186; R. Doc. 1-1, at 89 ¶10; App. 162; R. Doc. 1-1, at 65 ¶15; App. 26, 28-29, 33; R. Doc. 25, at 26, 28-29, 33; App. 996; R. Doc. 9-1, at 1 ¶5; App. 1044; R. Doc. 16, at 4 ¶6.)

As for the geographical area in which commerce is sought to be restrained by NavSav, that is Nebraska. In other words, the "transaction" that is at issue is primarily Nebraska commerce and whether it should be restrained on a post- employment basis. The NavSav post-employment non-competition covenant in the NavSav Agreements is a five-mile radius of 2625 South 104th Street in Omaha, which area is entirely within Nebraska. (App. 163, 165; R. Doc. 1-1, at 66, 68 ¶¶23, 27; App. 183; R. Doc. 1-1, at 86.) During NavSav's employment of Beber and Roach with Damon as the administrative assistant, 95% or more of the customers with which they had relationship were based in Nebraska. (App. 1045; R. Doc. 16, at 5 ¶10.) Following such NavSav's employment (which is the period in which restrictive covenants purport to apply), 99% or more of the customers with which they had relationship were based in Nebraska. (App. 1045-46; R. Doc. 16, at 5-6 ¶11.)

As for Universal, it is a Nebraska corporation and was licensed to sell insurance in Nebraska. (App. 161; R. Doc. 1-1, at 64 ¶5; App. 186; R. Doc. 1-1, at 89 ¶10; App.

273, 275; R. Doc. 1-1, at 176, 178 ¶¶5,19-20.) Universal maintained a Nebraska office and employed Employees to work in Nebraska, and advertised Employees as Universal's Nebraska team. (App. 161-62; R. Doc. 1-1, at 64-65 ¶¶5,11; App. 521; R. Doc. 1-1, at 65 ¶¶3-4; App. 1047; R. Doc. 16, at 7 ¶15, App. 874-75; R. Doc. 1-1, at 2-3 ¶¶8-14; App. 1044; R. Doc. 16, at 4 ¶6 .). Universal sold its Nebraska insurance business to NavSav "out of Omaha, Nebraska." (App. 996; R. Doc. 9-1, at 1 ¶5.) The record reveals no Texas relationship to Universal.

As for Beber, neither NavSav nor Universal assigned him to work in Texas and Beber was never licensed to sell insurance policies in Texas. (App. 161-62, 65-66; R. Doc. 1-1, at 64-65 ¶¶2-5, 11, R. Doc. 1-1, at 68-69 ¶¶26-29.) At all times during his employment with NavSav and Universal, he resided in Nebraska, officed in Nebraska and paid Nebraska income tax. (*Id.*) Following his NavSav employment, Beber works for UNICO and offices in Nebraska. (*Id.*) During NavSav's employment of Beber, 95% or more of the customers with which he had relationship were based in Nebraska. (App. 1045; R. Doc. 16, at 5 ¶10.) Following NavSav's employment (which is the period in which restrictive covenants purport to apply), 99% or more of the customers with which he had relationship were based in Nebraska. (App. 1045-46; R. Doc. 16, at 5-6 ¶11.)

As for Roach, neither NavSav nor Universal assigned him to work in Texas and Roach was never licensed to sell insurance policies in Texas (App. 521, 524-28; R.

25

Doc. 1-1, at 65, 68-72 ¶¶2-5, 18-21, 32, 45.) At all times during his employment with NavSav and Universal, he resided in Nebraska, officed in Nebraska and paid Nebraska income tax. (*Id.*) Following his NavSav employment, Roach works for UNICO and offices in Nebraska (*Id.*)

As for Damon, though NavSav desperately argues that Damon had a ***home office*** in Iowa, NavSav ***admits*** that Damon is "doing business in Omaha, Nebraska" and "the primary office location Defendants Damon, Roach, and Beber worked during their employment with [NavSav] . . . was located at 2625 140th Street, Omaha, Nebraska 68144." (App. 190; R. Doc. 1-1, at 93 ¶5, App. 193; R. Doc. 1-1, at 96 ¶14; App. 186; R. Doc. 1-1, at 89 ¶6; App. 1046; R. Doc. 16, at 6 ¶13.) The District Court recognized Damon's use of her home office in Iowa (App. 49; R. Doc. 21, at 3), but it also made numerous other factual findings regarding substantially greater connections to Nebraska before, during and after Damon's employment with NavSav. (App. 48-52, 55-56, 68- 73; R. Doc. 21, at 2-6, 9-10, 22-27.)

As an employee of Universal, Damon was never assigned to solicit or procure policies or customers and never did solicit or procure policies or customers. (*Id.*) In or around August 2017, she was promoted to "Lead Marketing CSR" for Universal. (*Id.*)

As an employee of Universal, Damon was assigned to Universal's Nebraska office, and her job duties while employed by Universal were administrative and included servicing Universal's commercial accounts, submitting claims, and

26

addressing billing issues, and at no time did her job duties involve trying to solicit or procure policies or clients. (App. 874-75; R. Doc. 1-1, at 2-3 ¶¶14-15.) In 2016, Universal allowed Damon to work remotely, though her office assignment remained Universal's Nebraska office. (*Id.* ¶14.) Damon's at-will employment with NavSav started on or about April 12, 2022 (App. 875; R. Doc. 1-1 at 3 ¶16.)

Throughout her employment with NavSav, Damon (a) was never assigned to solicit or procure policies or customers and never did solicit or procure policies or customers (instead her job duties were solely administrative); (b) was assigned to NavSav's Nebraska office, and permitted to work remotely (she never worked from Texas); (c) was assigned a signature block on her NavSav email account listed her address as NavSav's Omaha office located at 2625 South 140th Street, Omaha, Nebraska 68144; and (d) observed that NavSav's website and the business cards provided to her by NavSav listed the same address. (App. 878; R. Doc. 1-1, at 6 ¶¶29-31.) Following her NavSav employment, Damon provided administrative services (never soliciting or procuring customers for UNICO) and officed at the UNICO Lincoln office more than 5 miles away from the NavSav Omaha office where she primarily worked during her employment with Universal and NavSav. (App. 879; R. Doc. 1-1, at 7 ¶¶38-40.)

On October 16, 2014, Damon secured a Nebraska resident license so that she could perform services for Universal as an account manager for property, casualty and

27

personal lines of insurance. (App. 1043-44; R. Doc. 16, at 3-4 ¶¶2-3.) From issuance on October 16, 2014, to date, she maintained that license, though it converted to a "non- resident" license in 2016 after she moved to Ankeny, Iowa. (*Id.*) From issuance on October 16, 2014, to date, Damon's Nebraska license notes her business address as the Omaha office location and her business phone fax numbers as Omaha numbers starting with the Nebraska "402" area code. (*Id.*)

In March/April 2016, Damon moved to Ankeny, Iowa, and worked remotely for Universal from her home. (App. 1044; R. Doc. 16, at 4 ¶4.) She was assigned Universal's Nebraska office as her primary office, and she occasionally was physically present at that office. (*Id.*) On May 2, 2016, she secured an Iowa resident license, so that she could perform services for Universal, which license notes her business address as Universal's Nebraska office and her business fax and phone numbers as Universal's Nebraska numbers. (*Id.* ¶5.)

On or before April 11, 2022, Damon's employment with Universal ended, and on April 12, 2022, she began her at-will employment with NavSav, in the position of Account Manager performing administrative duties almost exclusively for Beber. (App. 1045-46; R. Doc. 16, at 5-6 ¶11.) She did not solicit or procure policies or clients, and was never paid commissions. (*Id.*) ***Throughout her employments***, Universal and NavSav (a/k/a in Nebraska by the tradename "Universal") advertised Damon as a member of the "Nebraska Team," and provided her with business cards and an email

28

signature block noting her location as the "Universal" Nebraska office with Nebraska phone and fax numbers. (App. 1044-45; R. Doc. 16, at 4-5 ¶¶6-8.) Accordingly, in making its factual findings in light of NavSav's judicial admissions and these uncontested facts, the District Court committed no clear error in finding that Texas does not have a substantial relationship to the parties and the transaction and that Nebraska indeed does have a materially greater interest over any other State as to each party (every party is located, in whole or in part, in Nebraska), to the employment and post- employment conduct of the parties (no Texas conduct) and to the Nebraska commerce (no Texas commerce) sought to be restrained. As such, the Texas choice of law provision in the NavSav Agreements was ineffective and properly disregarded.

In the absence of an effective choice of law, the District Court again made error-free factual findings consistent with § 188 (2) that the NavSav Agreements should be governed by Nebraska law, namely that (1) Beber and Roach signed in Nebraska, with no evidence of the location of Damon's place of signature, other than none signed in Texas; (2) there appeared to be no negotiations, just electronic transmission of the drafts to Employees; (3) the place of performance was most substantially Nebraska, with little in Iowa and none in Texas; (4) the location of the applicable subject matter of the covenant not compete is exclusively Nebraska and of the non-solicit covenant is 95% - 99% Nebraska, with none in Texas; and (5) NavSav admitted that "the primary office location Defendants Damon, Roach, and Beber worked during their employment

29

with [NavSav] . . . was located at 2625 140th Street, Omaha, Nebraska 68144." (App. 193; R. Doc. 1-1, at 96 ¶14; App. 186; R. Doc. 1-1, at 89 ¶6). The residence of Beber and Roach is Nebraska, and Damon and NavSav maintain a Nebraska office and insurance license, and the place that business/commerce sought to be restrained is exclusively Nebraska under the non- compete and dominantly Nebraska under the non-solicit. As such, the District Court correctly applied Nebraska law to the NavSav Agreements.

Incidentally, though NavSav references the choice of forum provision in the NavSav Agreements, NavSav does not and cannot reference or challenge a ruling that Nebraska is the appropriate venue, because none exists in the appellate record. Br. 1-2, 19-20. Indeed, NavSav challenged the Nebraska venue in its motions to dismiss or alternatively to transfer the cases to Texas, which were not ruled on when NavSav appealed, but have since been denied. Entry ID 5351385. During the injunctive hearings, NavSav stated, "But we would submit that the preliminary injunction motions cannot even be resolved until this Court is satisfied that the case should remain here and not go to Texas." (Transcript of Preliminary Injunction Proceedings, at 41:12-18.) NavSav did not move for a stay. The District Court discussed this issue, correctly found that NavSav did not develop that argument, and "declined NavSav's invitation to delay ruling on the Motion for Preliminary Injunction until after consideration of the Motions to Dismiss or Transfer." Entry ID 5351385. The point is simply that there

is no statement of issue or argument that the District Court made an erroneous venue ruling.

## V. THE DISTRICT COURT DID NOT ERR OR ABUSE ITS DISCRETION IN HOLDING THE UNIVERSAL AGREEMENTS TO BE UNASSIGNABLE AND PROHIBITING NAVSAV FROM ENFORCING THE UNIVERSAL AGREEMENTS.

NavSav's fourth argument relates to statement of issue No. 8, in which NavSav challenges the District Court's ruling that the Universal Agreements were not assignable. Br. 36. NavSav creates a straw man ruling – that the District Court determined the Universal Agreements are "personal services contracts" – so it can argue that the Universal Agreements are not personal services contracts. NavSav misconstrues the District Court's analysis and Nebraska law. Moreover, even if this were the correct legal analysis, the content of the Universal Agreement demonstrates it is a personal services contract and thus not assignable even under NavSav's own legal rubric.

In *Griffeth v. Sawyer Clothing, Inc.*, 202 Neb. 631, 637, 276 N.W.2d 652, 655 (1979), the Nebraska Supreme Court stated a rule concerning the assignability of "contracts containing covenants which impose restraint upon competition." That rule, quoted by the District Court is:

> We believe that the better rule in the assignability of such contracts would be to limit that assignability strictly to the intent of the parties as disclosed by the language of the instrument if it is complete and unambiguous. Where the language in the contract

31

> regarding assignment is susceptible of more than one construction, or is vague or ambiguous, extrinsic evidence may be received for the purpose of determining the intent of the parties.

The word "such" quoted above refers to "contracts containing covenants which impose restraint upon competition" that the Nebraska Supreme Court was referencing earlier in the same paragraph. *Id.* "Such" in that quoted passage is not restricted to "personal services contracts" as NavSav's suggests. Br. 31-32. The distinction is critical: Nebraska public policy disfavors post-employment restrictive covenants that impose restraints on competition as the Nebraska Supreme Court made clear in *Griffeth*. "Courts generally do not look with favor upon restraints against competition." *Id. See also Agrigenetics, Inc. v. Rose,* 62 F.3d 268, 270 (8th Cir. 1995) ("[T]he law does not look with favor upon restrictions against competition, and an agreement which limits the right of a person to engage in a business or occupation will be strictly construed and will not be extended by implication or construction beyond the fair or natural import of the language used.") (quoting *Adams v. Adams*, 156 Neb. 778, 58 N.W.2d 172 (1953)). Although Nebraska courts allow more restrictive noncompetition covenants with business sale, the Universal Agreements are plainly employment agreements.

The Universal Agreements are plainly "contracts containing covenants which impose restraint upon competition," so the District Court properly applied *Griffeth* and determined that the Universal Agreements are not assignable based on the fact that the

32

Universal Agreements are silent as to assignability and as to inuring to the benefit of successors and assigns, thus demonstrating, on this record, no intent that either party could assign the Universal Agreements.

This Court need not determine whether the Universal Agreements are personal services contracts. But, if it does, the record shows that they are personal services contracts and thus not assignable. *See Earth Sci. Lab'ys, Inc. v. Adkins & Wondra, P.C.,* 246 Neb. 798, 801, 523 N.W.2d 254, 257 (1994). Relying on *Symphony Diagnostic Servs. No. 1 Inc. v. Greenbaum,* 828 F.3d 643, 647 (8th Cir. 2016), NavSav argues that the Universal Agreements are not personal services contracts because they do not require affirmative actions by Beber, Roach and Damon, and instead they only prohibit certain conduct. That is simply untrue.

Section 2 of the Universal Agreements requires the Employees to be "solely responsible to collect all fees and premiums on insurance and bonds that he or she has produced, as well as services that he or she performed." (App. 397-98, 399- 400, 1009-10; R. Doc. 8-5, at 1-2, R. Doc. 8-6, at 1-2, R. Doc. 9-5, at 1-2.) Section 7 requires each of them to remit payments to Universal. (*Id.*) These are indeed exclusive, affirmative actions required of them. The Universal Agreements do not say 'in consideration of employment,' instead, those agreements created the employment relationship by stating in Section 1, "Universal Group agrees to employ Employee, and Employee agrees to become so employed, under the terms of this Agreement", and

33

Beber, Roach and Damon affirmatively agreed to be employed and render employment related services for compensation. (*Id.*) Factually, NavSav's primary argument fails because the Universal Agreements contain affirmative obligations in addition to restrictive covenants – which is very different from the agreements at issue in *Greenbaum*.

Regarding the conclusions of law, based on *Griffeth*, the District Court accurately predicted how the Nebraska Supreme Court would rule on the Universal Agreements. The Nebraska Supreme Court held that "the better rule in the assignability of such contracts would be to limit that assignability strictly to the intent of the parties as disclosed by the language of the instrument if it is complete and unambiguous." *Griffeth* at 202 Neb. 637-38. This broad proposition is not limited to non-compete covenants in the sale of business context, and instead appears both textually and logically to apply in any context, including post-employment covenants.

This is particularly true given Nebraska's longstanding public policy that courts will not enforce or reform restrictive covenants that are even slightly too board to protect an employer's legitimate business interest. *DCS Sanitation Mgmt., Inc. v. Castillo*, 435 F.3d 892, 897 (8th Cir. 2006); *see also Unlimited Opportunity, Inc. v. Waadah*, 290 Neb. 629, 634-35, 861 N.W.2d 437, 441 (2015). References to other States' laws and public policies in this particular area are not predictive of Nebraska laws and public policies. There is nothing in the Universal Agreements to suggest that

Beber, Roach and Damon's employment or required affirmative actions were assignable. Universal could have but failed to include typical language like "employer and its successors and assigns." Given the affirmative actions required of Beber, Damon and Roach and the lack of permission granted to Universal to assign those agreements should Universal later sell its assets, there is no assignability intent disclosed by the contractual language, and the general rule that personal services contracts cannot be assigned without the other party's consent should apply.

Even if the Universal Agreements (Damon and Roach's Universal Proprietary Information Agreements and Beber, Damon and Roach's Universal employment agreements) are assignable (and were properly assigned), they were superseded and replaced by the NavSav Agreements. The Universal Agreements were assigned to NavSav on April 14, 2022. (App. 392; R. Doc. 8-3, at 1). The NavSav Agreements were signed thereafter on the following dates: Beber on April 25, 2022 (App. 163; R. Doc. 1-1, at 66 ¶20); Roach on April 26, 2022 (App. 522; R. Doc. 1-1, at 66 ¶12); and Damon on April 18, 2022. (App. 875, App. 1047; R. Doc. 1-1, at 3 ¶20, R. Doc. 16, at 7 ¶15.) The NavSav Agreements state that "[t]he parties herein desire to define the nature and terms of Employee's employment and further define Employee's duties to NavSav after Employee's termination from employment with Employer for any reason" and "Employer hereby employs Employee and Employee accepts such employment under the terms the parties have agreed to." (App. 306, 529, 913; R. Doc.

35

1-1, at 209, 73, 41.) The NavSav Agreements (§§ 4 -7) then address topics competition, solicitation of customers or employees, and protection of confidential information. Thus, NavSav chose to replace prior Universal provisions on these topics and require new NavSav provisions on these same topics. The Universal Agreements were indeed superseded and replaced by the comprehension and subsequent NavSav Agreements. Indeed, NavSav attorney's post-employment demands only reference the NavSav Agreements, with no mention of the Universal Agreements. (App. 879; R. Doc. 1-1, at 7 ¶41; App. 911-921; R. Doc. 1-1, at 39-49.) The Universal Agreements did not survive and are thus not enforceable.

Even if the Universal post-employment restrictive covenants are assignable, Roach's and Damon's Universal 1-year post-employment restrictive covenants expired on April 12, 2023, before their employment ended with NavSav on June 16, 2023. (App. 397-98, 1009-10; R. Doc. 8-5, at 1-2, R. Doc. 9-5, at 1-2; App. 999; R. Doc. 9-1 at 4 ¶15; App. 385; R. Doc. 8-1, at 4 ¶16; Transcript of Preliminary Injunction Proceedings, at 40:5-16.) Incidentally, in claiming that Damon solicited NavSav clients, NavSav cites to evidence that was not admitted, the exclusion of which is not the subject of this appeal. (Br. 7-8; App. 55-56; R. Doc. 21, at 9-10.)

Finally, NavSav complains that the District Court should have considered extrinsic evidence. Br. 36. despite the fact that the Court did not find the Universal Agreements were vague or ambiguous. The District Court properly found that the

36

Universal Agreements contain no indication of any intent to allow them to be assigned. Because the District Court did not find ambiguity, there was no need to look to extrinsic evidence on this issue. But, NavSav ignores the fact that the District Court held an evidentiary hearing and the parties admitted substantial evidence concerning the Universal Agreements and NavSav Agreements; however nothing in the record would indicate that the parties to the Universal Agreements intended that Universal could unilaterally assign them to NavSav. Nor did NavSav ask the District Court for an opportunity to admit additional extrinsic evidence concerning the parties' intent regarding assignability of the Universal Agreements after that evidentiary hearing. And now on appeal, NavSav believes it should have that opportunity even though NavSav does not state that it could produce extrinsic evidence that would demonstrate that all parties to the Universal Agreements had the intent at the time they signed the agreements that Universal could unilaterally assign those agreements to NavSav.

For the reasons and authorities referenced by the District Court and those referenced herein, the District Court did not err in holding that the Universal Agreements were not assignable, and even if this Court disagrees, the Universal Agreements were (i) superseded by the NavSav Agreement, and (ii) unenforceable under Nebraska law. The relief granted by the District Court was correct for these multiple and alternative reasons.

Appellate Case: 23-2965    Page: 44    Date Filed: 01/12/2024 Entry ID: 5352978

## VI. THE DISTRICT COURT DID NOT ERR OR ABUSE ITS DISCRETION IN GRANTING A PRELIMINARY INJUNCTION AS THE *DATAPHASE/WINTER* FACTORS WERE SATISFIED.

NavSav's fifth argument relates to statements of issue Nos. 1, 5 and 7. NavSav challenges the District Court's findings that Employees would sustain irreparable injury, they would likely succeed on the merits under Texas law, in balancing of harms and public interest. Again, in determining whether the District Court abused its discretion in granting the injunctions, this Court should examine whether the District Court based its balancing of the *Winter* factors on clearly erroneous factual findings or on an erroneous legal conclusion. *See Wise v Dep't of Transportation*, 943 F.3d at 1161, 1165 (8th Cir. 2019). Indeed the District Court flexibly balances the "particular circumstances" in each case to correctly determine that Employees are entitled to the Preliminary Injunctions. *Id.* at 20; *Dataphase* at 112.

### A. The District Court did not abuse its discretion in determining Beber, Roach, and Damon would suffer irreparable harm absent a preliminary injunction.

The District Court correctly cited actual and anticipated irreparable harm sustained by Beber, Roach, and Damon based on restraints on trade and commerce in Nebraska by applying Texas law and public policy that was inconsistent with Nebraska law and public policy. NavSav contorts the factual findings and argues "the District Court erred in finding irreparable harm exists." Br. 41.

To the contrary, the District Court applied the reasoning of a case from the

38

Eleventh Circuit Court of Appeals which reversed a district court decision denying a request for injunctive relief for lack of irreparable harm. (App. 36; R. Doc. 25, at 36.) In *MacGinnitie v. Hobbs Grp., LLC*, 420 F.3d 1234, 1242 (11th Cir. 2005), the court found that the plaintiff "has shown irreparable harm which cannot be undone through monetary remedies, in the form of unenforceable restrictions on his access to customers, employees, and information. These injuries are in the form of lost opportunities, which are difficult, if not impossible, to quantify." *Id.*

The District Court found irreparable harm exists as Employees' lost opportunities would be difficult to quantify. (App. 36; R. Doc. 25 at 36 quoting *MacGinnitie*, 420 F.3d at 1242). Indeed, this Court has held that "deprivations of temporally isolated opportunities, are exactly what preliminary injunctions are intended to relieve." *D.M. by Bao Xiong v. Minnesota State High Sch. League*, 917 F.3d 994, 1003 (8th Cir. 2019). Based on uncontroverted facts, the District Court's findings that Employees would lose opportunities if the restrictive covenants are enforced are not clearly wrong.

The District Court further recognized that Nebraska and Georgia have similar public policy considerations that disfavor restrictive covenants in employment agreements. (App. 36; R. Doc. 25, at 36.) NavSav does not challenge the District Court's reasoning on this point or the Eleventh Circuit Court of Appeals' reasoning in *MacGinnitie*. Instead, NavSav argues that the Georgia legislature subsequently enacted

a statute governing the enforcement of restrictive covenants thus this Court should (1) disregard *MacGinnitie;* and (2) find that the District Court's decision was clearly erroneous because the District Court gave credence to the logic in the *MacGinnitie* decision and determined in light of Nebraska's clear public policy against overbroad restrictive covenants that the Nebraska Supreme Court would apply the same logic. Br. 40.

NavSav is wrong. The logic of *MacGinnitie* stands independent of a subsequent legislative change of the law. The District Court opined that the Nebraska Supreme Court would find that "a restrictive covenant would inflict irreparable harm because it would violate Nebraska public policy" as correctly reasoned in *MacGinnitie*. (App. 36; R. Doc. 25, at 36.)

The District Court did not reach an erroneous legal conclusion; it reached a conclusion that is consistent with positions the Nebraska Supreme Court has repeatedly taken in the context of restrictive covenants and found that irreparable harm is present in the context of NavSav's attempt to enforce the NavSav Agreements. *Wise*, 943 F.3d at 1165; (App. 35; R. Doc. 25, at 35.)

NavSav mistakenly – and hyperbolically – laments that "if the [decision] is allowed to stand the success on the merits and irreparable harm prongs would no longer be separate in the Eight Circuit…litigants in this would only need to demonstrate that the underlying agreements was enforceable to show irreparable harm on which to grant

40

an injunction." Br. 40. The District Court neither merged the first (likelihood of success on the merits) and second (irreparable harm) *Winter* prongs nor opened the door for any litigant who could demonstrate an agreement is enforceable to argue it has likely suffered irreparable harm.

Furthermore, while the success on the merits prong does involve analyzing whether a covenant is enforceable, that does not necessarily mean that irreparable harm would be found. To win on irreparable harm, a party must show that "irreparable injury is likely in the absence of an injunction, and not merely a 'possibility'." Br. 37; quoting *Winter*, 555 U.S. 7. Here the District Court analyzed both the likelihood of success and irreparable harm prongs based on the facts before it, and found both that the Employees had a strong likelihood of success and that the lost opportunities they would face were more than a mere possibility.

The District Court analyzed likelihood of success on the merits as a separate prong while correctly noting that overlap may exist between certain prongs. (App. 18-38; R. Doc. 25, at 18-38.) That analysis has been discussed in detail *supra* as NavSav raises several issues concerning the District Court's analysis of choice of law, enforceability of the NavSav and Universal Agreements, and assignability of the Universal Agreements. Only then did the District Court proceed to the second *Winter* prong, irreparable harm. There, the District Court addressed each argument raised by Beber, Roach and Damon. It reached the conclusion that there was irreparable harm

Appellate Case: 23-2965     Page: 48     Date Filed: 01/12/2024 Entry ID: 5352978

based on the conflict between Nebraska public policy and enforcement of the restrictive covenants and in recognition of the harm individuals like Beber, Roach, and Damon could suffer in absence of an injunction: loss of access to customers and information, which creates lost opportunities that are difficult if not impossible to quantify. (App. 33-37; R. Doc. 25, at 33-37); *see MacGinnitie* 420 F.3d at 1242.

The District Court did not "merge" these prongs. While analyzing the success on the merits prong involved analyzing whether a covenant is enforceable, that does not necessarily mean that irreparable harm would be found; instead, evidence must show that "irreparable injury is likely in the absence of an injunction, and not merely a 'possibility'." Br. 37; quoting *Winter*, 555 U.S. 7. The District Court analyzed both the likelihood of success and irreparable harm prongs based on the evidence, and found both that Appellees had a strong likelihood of success and that the lost opportunities they would face were more than a mere possibility.

The District Court's decision does not have far reaching applications outside of the context of potential injunctive relief for restrictive covenants that are unenforceable under Nebraska law. NavSav attempts to cast the impact as applying to any "underlying agreement" that is "enforceable." Br. 40. This case involves a finding by the District Court that the underlying agreement is *unenforceable* thus it is difficult to see how the District Court's decision and this Court's affirmation of that decision would apply to *enforceable* agreements. Additionally, this case involves enforcement of post-

42

employment restrictive covenants and the harm caused by potential enforcement of those agreements; this is a sub-category of contract law that has different policy considerations and often different rules of construction than other contract provisions. Finally, this case involves the State of Nebraska's own particular policy considerations relating to restrictive covenants, which are different from many other jurisdictions. This case is not unique, but it also is not an everyday contract dispute and the District Court's decision does not represent a sea change in application of the *Winter* factors.

**B.     The District Court did not abuse its discretion in determining that the balance of harms favors Employees.**

The District Court found that the balance of harms favors Employees because the possibility of harm to NavSav was very low due to the fact that the NavSav Agreements are plainly unenforceable as a matter of law. *See* (App. 37-38; R. Doc. 25, at 37-38.) "In each case, courts must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24. (internal quotations omitted). The District Court correctly recognized the real risk of harm to Beber, Roach, and Damon as discussed *supra*.

In contrast, the injury to NavSav is very low (as the NavSav Agreements are unenforceable) and could be addressed through money damages in the event NavSav asserts counterclaims and somehow proves that the NavSav Agreements are enforceable. NavSav concedes this point and shows that it can specifically estimate its

claimed financial damages to date. Br. 42. Notably, entry of injunctive relief against NavSav does not prohibit NavSav from competing with the Beber, Roach, and Damon; it does not prohibit NavSav from contacting and negotiating with the customers it claims to have lost; and it does not prohibit NavSav from doing business with the customers that it claims to have lost. To the extent that NavSav has lost premiums, the District Court's preliminary injunction is not the cause of those lost premiums.

The only "harm" or "injury" that the District Court's entry of an injunction against enforcement of the restrictive covenants while litigation is pending is that NavSav is required to litigate the merits of its case in Nebraska – the state in which NavSav has an office and is licensed to sell insurance; the state in which NavSav assigned Beber to solicit customers; the state in which NavSav enjoyed all of the benefits of doing business—generating revenue in Nebraska, hiring Nebraska residents and employees, paying Nebraska wages, and setting non-compete and non- solicit restraints of trade in Nebraska. The injunction does not limit NavSav's ability to assert counterclaims against Employees to recover its claimed losses. The District Court did not abuse its discretion in finding that the balance of harms favors Beber, Roach, and Damon.

**C.     The District Court did not abuse its discretion in determining that Employees are likely to succeed on the merits of their claims.**

NavSav's argument that the District Court improperly found Employees are

44

likely to succeed on the merits of their claims starts with a critical error: "The non-solicitation clause is enforceable in Texas." Br. 43. This is despite the fact that the District Court determined that Nebraska – not Texas – has a materially greater interest in this case than Texas in part because it is "fundamental policy of the state of Nebraska that a noncompete agreement that is unreasonable cannot be reformed in order to make it enforceable." (App. 25; R. Doc. 25, at 25.) In making this finding, the District Court received briefing, evidence, and oral argument, weighed those arguments and evidence, and issued a reasoned memorandum of law. NavSav asks the Court here to re-weigh that evidence anew and find Texas law must apply. NavSav's argument hinges solely on the Court rejecting the District Court's choice of law analysis. Indeed, NavSav cites only Texas case law and Texas statutes to argue that the restrictive covenants in the NavSav Agreements are enforceable as written. NavSav thus implicitly recognizes that the NavSav Agreements are not enforceable if Nebraska law applies. For the reasons stated in the District Court's memorandum and order and those stated in Section IV *supra,* Nebraska law applies and as a result, the District Court did not abuse its discretion in determining that Employees are likely to succeed on the merits of their claims.

Additionally, it is not clear whether the restrictive covenants would be enforceable as written under Texas law. Under Texas law, court *must reform* overbroad restrictive covenants. *See Wright v. Sport Supply Grp., Inc.*, 137 S.W.3d 289, 298-99

45

(Tex. App. 2004) (stating that Tex. Bus. & Com. Code Ann. § 15.51(c) requires the court to reform a covenant that it finds unreasonable as to time, geographical area, or scope of activity. The NavSav Agreements restrict employees from soliciting any "customer that is part of any book of business owned by NavSav or a NavSav related or affiliated entity." (App. 175; R. Doc. 1-1, at 78; App. 542; R. Doc. 1-1, at 86; App. 902; R. Doc. 1-1, at 30.) This would prohibit Employees from soliciting customers of NavSav's "related or affiliated" entities anywhere in the world even if they had no interaction with those customers during their employment with NavSav. It would prohibit Employees from soliciting customers that they might not have even known were customers of NavSav or related or affiliated entities. Even if Texas law were to apply (it does not), there is a strong chance that the NavSav Agreements would still not be enforceable as written and would require reformation pursuant to Texas law.

In this unlikely event, it would still be appropriate for the District Court to determine that Beber, Roach, and Damon were likely to succeed on the merits of their claims because the NavSav Agreements are unenforceable as written and for the District Court to enter an injunction prohibiting NavSav from enforcing the unenforceable agreements until they were reformed. However, the District Court did not address that issue and it did not take evidence necessary to determine whether the NavSav Agreements are enforceable as written under Texas law, let alone how they should be reformed in light of their breadth. Accordingly, the record before this Court

46

is insufficient to determine that Beber, Roach, and Damon were unlikely to succeed on the merits of their claims if the Court determines that the District Court abused its discretion by applying Nebraska law.

NavSav failed to prove that any of its clients transferred their business to UNICO *because* of solicitation from Appellees, as opposed to transfers on their own initiative, and Mr. Headlee's unfounded and speculative conclusions to the contrary were rightly given no evidentiary weight. (App. 800; R. Doc. 9-1, at 5 ¶20, App. 802; R. Doc. 9-1, at 7 ¶41; App. 1000; R. Doc. 9-1, at 5 ¶20.) Moreover, Mr. Headlee's interpretation of Appellees' pre-suit settlement offer as a threat to take NavSav's clients is equally unfounded and unreasonable. (App. 799-800; R. Doc. 9-1, at 4-5 ¶18; App. 999; R. Doc. 9-1, at 4 ¶17; App. 1048; R. Doc. 16, at 8 ¶4; App. 1061-65; R. Doc. 16, at 21-25.) These factual findings were not clearly wrong.

Note also that Iowa law would not enforce NavSav's or Universal's restrictive covenants against Damon as NavSav failed to show that Damon had substantial customer contact as a back-office administrative person. *Mut. Loan Co. v. Pierce*, 65 N.W.2d 405, 408-09 (Iowa 1954); *Moore Bus. Forms, Inc. v. Wilson*, 953 F. Supp. 1056, 1059, 64 (N.D. Iowa 1996) aff'd, 105 F.3d 663 (8th Cir. 1996).

Appellate Case: 23-2965    Page: 54    Date Filed: 01/12/2024 Entry ID: 5352978

**D. The District Court did not abuse its discretion in determining that Public Interest favors entry of an injunction.**

Nebraska law and public policy are clear regarding restrictive covenants that restrain individuals' ability to engage in commerce and pursue their chosen professions – they are disfavored. *Rose*, 62 F.3d 268, 270; *Griffeth*, 202 Neb. at 637. "When a covenant not to compete is unreasonable, the courts will not reform it as it is not the function of the court to reform unreasonable covenants not to compete solely for the purpose of making them legally enforceable." *H & R Block Tax Servs., Inc. v. Circle A Enterprises, Inc.*, 269 Neb. 411, 416, 693 N.W.2d 548, 553 (2005) Indeed, for a restrictive covenant to be enforceable in Nebraska, it cannot be "injurious to the public." *Gaver v. Schneider's O.K. Tire Co.,* 289 Neb. 491, 499, 856 N.W.2d 121, 127 (2014).

While it is in the public interest to enforce contractual obligations – that interest is only enforcing valid contractual obligations. *Cf. Sleep No. Corp. v. Young,* 33 F.4th 1012, 1019 (8th Cir. 2022). NavSav also claims that it is somehow deprived of its opportunity to proceed with its case in court. That is not true. The District Court's preliminary injunction precludes NavSav from taking actions to enforce the invalid NavSav Agreements and Universal Agreements. It does not prevent NavSav from asserting counterclaims, third-party claims, or defending itself in this case.

48

Given Nebraska's strong public policy limiting enforceability of restrictive covenants, the District Court did not abuse its discretion by determining that the public interest of Nebraska is served by entering an order that prohibits NavSav from attempting unenforceable restrictive covenants that are injurious to the public.

## CONCLUSION

On the record presented, the District Court's factual findings were well supported and not clearly erroneous, and there was no abuse of discretion in entering the Preliminary Injunctions. The Preliminary Injunctions are sufficiently tailored, and allow NavSav full opportunity to pursue its defenses, counterclaims and third party claims before the District Court, *but not in Texas*. At the earlier stage of the proceedings, there is no reason to second guess the scope of the Preliminary Injunctions, and this Court should leave it to the District Court to determine in future proceedings, benefited by the completion of the pleadings and discovery phases, whether the Preliminary Injunctions should be modified or dissolved.

49

Dated: January 12, 2023.

Respectfully submitted,

/s/ *Gregory C. Scaglione*

Gregory C. Scaglione, #19368
Andrew Tugan, #26917
(*application pending*)
Emily M. Coffey, #27308
(*application pending*)
Timothy R. Hutchinson, #27880
(*application pending*)
One Pacific Place, Suite 800
1125 South 103rd Street
Omaha, NE 68124
(t) (402) 390-9500
(f) (402) 390-9005
Greg.scaglione@koleyjessen.com
Andrew.tugan@koleyjessen.com
Emily.coffey@koleyjessen.com
Timothy.hutchison@koleyjessen.com

Attorneys for Plaintiffs/Appellees

50

## CERTIFICATE OF COMPLIANCE

1. This motion complies with the type-volume limitation of Fed. R. App. P. 27(d)(2)(A) because it contains 12,184 words.

2. This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in fourteen point Time New Roman font.

3. This brief has been scanned with antivirus software and is virus-free.

Dated: January 12. 2024.

/s/ *Gregory C. Scaglione*

Attorney for Plaintiffs-Appellees

## CERTIFICATE OF SERVICE
### FOR DOCUMENT FILED USING CM/ECF
### Certificate of Service When All Case Participants Are CM/ECF Participants

I hereby certify that on January 12, 2024, I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Eighth Circuit by using the CM/ECG system. I certify that all participants are registered CM/ECF users and that service will be accomplished by the CM/ECF system.

/s/ *Gregory C. Scaglione*

Attorney for Plaintiffs-Appellees

Appellate Case: 23-2965    Page: 58    Date Filed: 01/12/2024 Entry ID: 5352978